## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**ZAKIA RAFIQA SHABAZZ, et. al.,**

     **Plaintiffs,**

                             **Case No. 1:18-cv-339**

     v.                    **JUDGE DOUGLAS R. COLE**

**ICWU CENTER FOR WORKER**
**HEALTH & SAFETY**
**EDUCATION, et. al.,**

     **Defendants.**

### OPINION AND ORDER

This cause comes before the Court on Defendants International Chemical Workers Union ("ICWU") Council, ICWU Center for Worker Health & Safety Education ("ICWU Center" or "the Center"), Frank Cyphers, John Morawetz, and Lula Odom's (collectively "Defendants") Motions for Summary Judgment (Docs. 54, 55, 56, 57), filed on February 3, 2020. Plaintiffs United Parents Against Lead ("UPAL") and Zakia Rafiqa Shabazz[1] filed an Opposition (Doc. 59) on March 16, 2020 and Defendants replied (Docs. 62, 64, 65, 66) on April 30, 2020.

Also before the Court is Defendants' Motion to Strike (Doc. 61) the Affidavit of Beverly East ("East Affidavit," Doc. 59-7), which Shabazz had submitted in support of her Opposition (Doc. 59) to Defendants' Motions for Summary Judgment (Docs. 54, 55, 56, 57). The Motion to Strike has also been fully briefed (Docs. 67, 69).

---

[1] Unless otherwise stated or clear from context, the term "Shabazz" refers to Plaintiffs collectively.

For the reasons stated more fully below, the court **GRANTS** Defendants' Motions for Summary Judgment (Docs. 54, 55, 56, 57). As the Court's holding does not turn, one way or the other, on the contents of the East Affidavit, Defendants' Motion to Strike (Doc. 61) is **DENIED AS MOOT**.[2] Accordingly, the Court **DISMISSES** this action **WITH PREJUDICE**.

## BACKGROUND

Zakia Shabazz is the Founder and Chief Executive Director of UPAL, a non-profit organization that supports families and communities impacted by environmental hazards. (Am. Compl., Doc. 46, #756[3]; Pls. Resp. to Defs. Proposed Undisputed Facts, Doc. 59-12, #2172).

The ICWU Center was established by the ICWU in 1988 to provide training for employers and employees regarding worker health and safety matters. (Pls. Resp. to Defs. Proposed Undisputed Facts, Doc. 59-12, #2169).[4] The Center operates on a non-profit basis, and most of its activities are supported by grants from the National Institute of Environmental Health Sciences ("NIEHS"), which itself is part of the National Institute of Health ("NIH"). (*Id.*).

---

[2] Because the Court denies Defendants' Motion to Strike (Doc. 61) as moot, the Court does not discuss it at greater length in this Opinion. Consequently, the terms "Motions," "Opposition," and "Replies" refer solely to briefs related to Defendants' Motions for Summary Judgment, unless otherwise stated.

[3] Refers to PAGEID #.

[4] Aside from the ICWU Center and the ICWU Council themselves, all the other defendants in this case (including Cyphers, Morawetz, and Odom) are employees of these organizations. (Pls. Resp. to Defs. Proposed Undisputed Facts, Doc. 59-12, #2171–72). Because Shabazz does not bring any claims against these individual defendants that arise independently of their employment duties, in addressing claims against the Center and ICWU Council, the Court also addresses the claims against the individual defendants.

NIEHS principally funds the Center through two grants: (1) the Hazardous Waste Worker Health and Safety Training Program, and (2) the Hazmat Disaster Preparedness Training Program. Together, these grants are known collectively as the "Big Grant." (*Id.* at #2170). The Center applies for the Big Grant on five-year cycles. (*Id.*).

Although this litigation arises from two separate events involving Shabazz and Defendants, both events revolve around the Big Grant. First, Shabazz asserts various claims arising out of the Center's 2014 Big Grant application. Second, Shabazz brings claims related to the Center's 2016 efforts to obtain permission to use funds from the Big Grant to support training sessions in Flint, Michigan. The Court describes each of these events below.

**A.      The 2014 Big Grant Application**

The first event giving rise to Shabazz's claims involves the Center's 2014 Big Grant application. On September 9, 2014, defendant Lula Odom, a staff member at the Center, sent a mass email to organizations and individuals with whom the Center works. (*Id.* at #2175). The email explained that the Center was applying for the Big Grant and requested that the recipients provide letters of support to accompany the application. (*Id.*). Shabazz was one of this email's recipients. (*Id.*).

On September 11, 2014, Shabazz responded to Odom's email and provided four letters of support. (*Id.* at #2176). Two of the letters were from UPAL (one from Shabazz herself and one from her husband, who is also affiliated with the

organization), and two were from Shabazz and her husband in their personal capacities. (*Id.*).

On or about November 5, 2014, defendant Frank Cyphers, President of the ICWU Council, submitted the Big Grant application on the Center's behalf. (*Id.* at #2184–85; Opp., Doc. 59, #1564). Included in this application was one of the letters Shabazz had emailed Odom on September 11.[5] However, the finalized letter included in the Big Grant application differed from Shabazz's original in a few ways. First, the finalized version made certain non-substantive adjustments to the letter's spelling and terminology.[6] And, second, whereas Shabazz's original letter included an electronic signature, with her name presented in a script-style font, the finalized letter included a handwritten signature (sometimes referred to as a "wet ink signature"). (*Compare* Original Shabazz Ltr., Doc. 54-6, #1135 *with* Submitted Shabazz Ltr., Doc. 46, #771).

Shabazz agrees that the finalized letter's content reflected her position at the time it was submitted. (Shabazz April Depo. Excerpts, Doc. 54-8, #1208–09). Nonetheless, she argues that the Defendants "forged" her handwritten signature on the letter. (Shabazz Sept. Depo. Excerpts, Doc. 54-7, #1161; Opp., Doc. 59, #1539). For their part,

---

[5] It is unclear if the other three letters were used in the application. If they were used, they are not the subject of any claims in this litigation.

[6] Specifically, the finalized version of the letter included the following non-substantive changes: (1) "ICWUC Center" is changed to "ICWU Center;" (2) "1st" is changed to "First;" and (3) "1st Aid/CPR" is changed to "First Aid/CPR-AED." (*Compare* Original Shabazz Ltr., Doc. 54-6, #1135 *with* Submitted Shabazz Ltr., Doc. 46, #771).

Defendants respond that they do not know who affixed the wet ink signature to the finalized letter. (Mot., Doc. 54-1, #1000–02).

Although the Center submitted the Big Grant application in 2014, the alleged forgery did not come to light until Shabazz commenced litigation in 2017 to pursue her other claims (described in further detail below). (Pls. Resp. to Defs. Proposed Undisputed Facts, Doc. 59-12, #2199). After Shabazz voluntarily moved to dismiss her original case, she filed a new complaint (Doc. 1-2) (which she later amended (*see* Doc. 46)) against Defendants that raised several claims related to the alleged forgery.[7] Specifically, Shabazz alleges that the forgery constituted: (1) invasion of privacy under Ohio common law; (2) a violation of Ohio's Deceptive Trade Practices Act (ODTPA); (3) false endorsement under the Lanham Act; (4) fraud under Ohio common law; and (5) civil conspiracy. (Am. Compl., Doc. 46).

## B.     The 2016 Flint Training Session

Shabazz also brings claims related to the Center's 2016 efforts to obtain special permission from NIEHS to use funds from the Big Grant to conduct training sessions in Flint, Michigan.

---

[7] Shabazz filed her original Complaint *pro se* in Hamilton County Court of Common Pleas on January 10, 2017. (A1700121 Compl., Doc. 10-15, #361). That Complaint only brought claims arising from the 2016 events, described in the next section of this opinion. (*Id.*). After Shabazz retained counsel, she moved to dismiss that original case without prejudice on February 1, 2018. (A1700121 Mot. to Dismiss, Doc. 10-16, #368). She subsequently filed the first Complaint (Doc. 1-2) in this case on April 2, 2018, which included claims related to the allegedly forged signature. Shabazz filed her Amended Complaint (Doc. 46) on December 24, 2019.

In late 2015, it become public knowledge that the city of Flint's water supply had been contaminated by lead. (Pls. Resp. to Def. Proposed Undisputed Facts, Doc. 59-12, #2187). Employees at the Center began doing research into the issue and planning a potential training program in Flint. (*Id.* at #2189–90). On January 27, 2016, Shabazz contacted Odom regarding the situation in Flint, which led to a call that day between Center employees and Shabazz in which the water crisis was discussed. (*Id.* at #2191). On January 31, 2016, Shabazz emailed the Center to provide materials "to aid in the development of [a] Lead Poisoning Curriculum." (*Id.* at #2192). The Center did not ultimately use any of these materials in planning its training session. (*Id.* at #2193).

On February 4, 2016, the Center's Director, defendant John Morawetz, emailed the Center's contact at NIEHS regarding the situation in Flint. (*Id.* at #2193). Director Morawetz's email requested permission to use funds from the Big Grant to support "Train the Trainer" sessions in the Flint area. (*Id.*). In explaining the Center's plan, Morawetz stated:

> If the [Train the Trainer] class has a sufficient attendance, we will extend it to three days to permit all new trainers to have time to prepare and present modules. We are in communication with CBTU [(Coalition of Black Trade Unionists)] chapters in Detroit, Lansing and the Detroit Fire Academy. The Richmond, Virginia CBTU CARAT [(Community Action and Response Against Toxics)][8] Team is headed by Zakia Shabazz, the Director, [UPAL] and her letter of support was in our competitive application.

---

[8] Although "CBTU primarily provides services for union-represented employees, it has established Community Action and Response Against Toxics (CARAT) Teams for many of its local chapters to provide services primarily in minority communities regarding toxic substances." (Pls. Resp. to Def. Proposed Undisputed Facts, Doc. 59-12, #2174).

6

(*Id.*).

On February 16, 2016, NIEHS granted the Center's request to use funds from the Big Grant to support its training sessions in the Flint area. (*Id.* at #2195–96). The training session was held in March 2016. (*Id.* at #2196). Shabazz was not involved in this training session, either as an instructor or as an attendee. (*Id.*).

Around May 2016, NIEHS issued its annual Director's Report. (*Id.*). The Report described the Center's training sessions in Flint earlier that year, stating, in pertinent part:

> [ICWU] Council has been funded to conduct lead awareness and 'train the trainer' classes in the Flint Michigan area. The three-day class will permit all new trainers to have time to prepare and present lead awareness modules. They are working with [CBTU] chapters in Detroit, Flint, and Lansing, as well as the Detroit Fire Academy. *The CBTU Team is headed by Zakia Shabazz, the Director of United Parents Against Lead.*

(*Id.* (emphasis added)). Both sides agree the Report's statement that Zakia Shabazz "headed" the CBTU Team at the Center's Flint training session is inaccurate. (*Id.* at #2197). However, the parties dispute *how* this error found its way into the NIEHS Director's Report.

Shabazz argues, in brief, that the error in the Director's Report arose from Defendants' deliberate (and successful) effort to mislead NIEHS to believe that Shabazz would lead the Flint training session to gain NIEHS approval to use Big Grant funds. As evidence, she points to what ICWU Center Director Morawetz said in his February 4 email to NIEHS (quoted above). In particular, Shabazz says that Morawetz's statement that she was heading the Richmond CBTU CARAT Team is

what gave NIEHS the false impression that she was involved in the training program. (Opp., Doc. 59, #1549–51). Defendants, by contrast, respond that the Report was prepared by an unknown writer at NIEHS, who simply misinterpreted Morawetz's February 4 email. (Center's Mot., Doc. 54-1, #1005). Thus, in Defendants' view, the Report's reference to Shabazz's role was little more than an innocent mistake and, moreover, one which was totally beyond Defendants' control, as the Center (a private organization) and NIEHS (a government agency) are separate entities.

Shabazz discovered the error in the Report when she conducted an internet search on herself in August 2016. (Pls. Resp. to Defs. Proposed Undisputed Facts, Doc. 59-12, #2198). Several months later, in January 2017, she sued the Defendants. (*Id.* at #2198–99). Shabazz's claims arising from Defendants' alleged use of her name to obtain funding for the Flint training session include: (1) violation of the ODPTA; (2) false endorsement under the Lanham Act; (3) invasion of privacy under Ohio common law; and (4) civil conspiracy.

## LEGAL STANDARD

Defendants have all moved for summary judgment. (Docs. 54, 55, 56, 57). In evaluating their Motions, the Court bears in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

8

But the non-moving party cannot defeat a motion for summary judgment merely by pointing to any factual dispute. As the Sixth Circuit has explained, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW & ANALYSIS

In her Amended Complaint (Doc. 46), Shabazz asserts five claims: (1) invasion of privacy under Ohio common law; (2) violation of ODTPA; (3) false endorsement under the Lanham Act; (4) fraud under Ohio common law; and (5) civil conspiracy. The Court addresses each of the five claims below, although it addresses the ODTPA and Lanham Act claims jointly, as the same framework applies to each. *Papa Ads,*

*LLC v. Gatehouse Media, Inc.*, No. 5:10-cv-203, 2011 WL 13186119, at *4 n.11 (N.D. Ohio Mar. 22, 2011).

A. **Shabazz's Invasion Of Privacy Claim Fails As A Matter Of Law.**

In the first count of her Complaint, Shabazz alleges that Defendants violated her rights under Ohio's common law right of publicity, which is a subspecies of Ohio's invasion of privacy tort. (Am. Compl., Doc. 46, #762). "A defendant is subject to liability under the Ohio common-law right of publicity tort when he 'appropriates to his own use or benefit the names or likeness of another.'" *Roe v. Amazon,* 714 F. App'x 565, 568 (6th Cir. 2017) (citing *Zacchini v. Scripps-Howard Broad. Co.*, 351 N.E.2d 454, ¶ 1 of syllabus (Ohio 1976), *rev'd on other grounds*, 433 U.S. 562 (1977)). In order to prevail on this claim, in addition to showing misappropriation, the plaintiff "must demonstrate that [his or her] name or likeness has value." *Id.* (citing *Zacchini*, 351 N.E.2d at 458 n.4).

Shabazz alleges that Defendants violated her right of publicity in two distinct ways: first, by allegedly forging her signature in her letter of support for the Big Grant; and second, by Defendants' use of her name to obtain funding for the Center's Flint training sessions. The Court addresses each of these claims in succession.

Shabazz first alleges that the Defendants violated her right of publicity by forging her signature on the letter of support in the Big Grant application. As Shabazz explains, "[t]he forgery of the signature of another is a recognized variant of the tort known generally as invasion of privacy. More specifically, forgery amounts to the appropriation of the name or likeness of another." (Opp., Doc. 59, #1547 (quoting

*James v. Bob Ross Buick, Inc.,* 855 N.E.2d 119, 122 (Ohio Ct. App. 2006)). Thus, Shabazz argues, because there remains a dispute of fact as to whether Defendants signed her name on the letter, the case must proceed to a jury. (Opp., Doc. 59, #1549).

While Shabazz is correct that the forgery of another's signature can constitute invasion of privacy under Ohio law, *see James,* 855 N.E.2d at 122, she has failed to create a genuine dispute as to whether her signature was, in fact, forged. Central to the Court's analysis here is the issue of consent. As the Supreme Court of Ohio has explained, "[c]onsent is generally an absolute defense to an invasion of privacy claim." *Lundsford v. Sterile of Ohio, LLC*, 165 N.E.3d 245, 254 (Ohio 2020) (citing Restatement (Third) of Employment § 7.06 (2015)). Thus, if Defendants can show that they had Shabazz's consent to use her signature, her invasion of privacy claim with regard to the alleged "forgery" fails as a matter of law.

Here, the parties agree that Shabazz emailed a letter to the Center on September 11, 2014. (Shabazz Sept. Depo. Excerpts, Doc. 54-7, #1160). This letter was identical to the one that the Center ultimately submitted in the Big Grant application aside from (1) a few minor, non-substantive changes, and (2) the form of the signature. (*Compare* Original Shabazz Ltr., Doc. 54-6, #1135 *with* Submitted Shabazz Ltr., Doc. 46, #771). Whereas the original letter included an electronic signature with Shabazz's name written in a script-style font, the finalized letter included the handwritten signature at the center of this litigation. (*Id.*). Thus, Shabazz indisputably consented to the use of her *electronic* signature for the purposes of the letter of support. The only question that remains is whether the distinction

between an electronic signature and a handwritten one is salient for the purposes of an invasion of privacy claim. In the Court's view, it is not.

Rather than drawing strong distinctions between electronic signatures and their traditional handwritten counterparts, Ohio law generally recognizes both forms of signature as equally effective. In *Ohio v. Martin,* the Eighth Appellate District considered whether Ohio's law requiring that a grand jury foreman or deputy foreman sign an indictment could be satisfied by way of electronic signature. The Court observed that

> the use of electronic signatures has become common place in the law. Indeed, the Ohio Uniform Electronic Transaction Act at R.C. 1306.06(A) provides that "a record or signature may not be denied legal effect or enforceability because it is in electronic form." The act further provides that "[i]f a law requires a signature, an electronic signature satisfies the law." R.C. 1306.06(D). Thus, under the act, the requirement … that either grand jury foreman or deputy foreman sign the indictment is satisfied by his or her electronic signature.

*Ohio v. Martin,* No. 106038, 2018 WL 2149730, at *6 (Ohio Ct. App. May 10, 2018); *see also Jones v. U-Haul Co. of Mass & Ohio*, 16 F. Supp. 3d 922, 934 (S.D. Ohio 2014) (stating that "[e]lectronic signatures are binding under Ohio law"); *Stephens v. Frisch's Big Boy Rests*., No. 1:19-cv-954, 2020 WL 4754682, at *3 (S.D. Ohio July 30, 2020). Accordingly, as a general rule, wet signatures and electronic signatures are both equally valid and effective under Ohio law.[9]

---

[9] The Court emphasizes that this general rule is just that: a *general* rule. But Ohio law leaves open the possibility that, in some circumstances, a signature in a specific form may be required. *See, e.g.*, Ohio Admin. Code 4121-3-18(B)(2) (stating that "district hearing officers, staff hearing officers and the commission will accept a written statement from a party, *signed in handwriting*[.]" (emphasis added)). But Shabazz has not identified, and the Court is not

Alternatively, Shabazz might argue that, even if Ohio law does not distinguish between electronic and wet signatures, another source of law or set of rules might, which may make the substitution of the latter for the former in the letter of support an appropriate basis for an invasion of privacy claim. For example, assume for a moment that the NIEHS would accept only support letters with wet ink signatures. If Shabazz provided a letter with an electronic signature, knowing that the Center could not rely on it for support, and the Center then changed that to a wet ink signature, so that it could rely on the letter, perhaps Shabazz could somehow craft an invasion of privacy claim out of that. And, when the Court explored that issue at oral argument, that is the direction Shabazz's attorney seemed to go. But when asked to point to any rule or regulation supporting the notion that the form of the signature mattered, the attorney could not do so. Rather, he just "thought" that "may" be the case. The summary judgment stage of litigation, though, is not an appropriate time to speculate what the case may be, but rather to present the evidence as to what the case is. In any event, the Court has found nothing that suggests that the form of the signature on support letters (i.e., whether electronic or wet ink) matters one whit in terms of the NIEHS grant application program.

Thus, Shabazz has identified nothing under Ohio law or NIEHS rules that suggest there is a meaningful distinction between wet and electronic signatures. Accordingly, Shabazz's invasion of privacy claim cannot proceed, at least with regard

---

aware of, any rule indicating that this case is a special circumstance which would mandate a departure from the general rule. Accordingly, the Court applies the general rule here.

to the allegedly forged letter of support. As previously explained: consent is fatal to an invasion of privacy claim, and Shabazz consented to the use of her signature to support the Big Grant application when she emailed her letter to the Center. The fact that the finalized letter substituted a wet signature for the electronic signature is irrelevant. Under Ohio law and NIEHS grant application rules, a signature is, generally speaking, a signature. Even assuming that the Defendants wrote Shabazz's name on the letter themselves (which has not been proven), for the purposes of Shabazz's invasion of privacy claim, that change to the form of signature is no different than adjusting the letter's font style or formatting.

In light of this finding, the Court grants Defendants' Motions for Summary Judgment with regard to Shabazz's invasion of privacy claim arising from the use of her signature in the Big Grant letter of support.

Shabazz next argues that Defendants are liable for invasion of privacy due to their use of her name in connection with their efforts to obtain funding for their training session in Flint. (Opp., Doc. 59, #1549–54). As evidence, Shabazz points to ICWU Center Director Morawetz's February 4, 2016, email to NIEHS, in which he stated that the Center was "in communication with CBTU chapters in Detroit, Lansing, and the Detroit Fire Academy. *The Richmond, Virginia CBTU CARAT Team is headed by Zakia Shabazz, the Director, [UPAL] and her letter of support was in our competitive application.*" (Center's Mot., Doc. 54-1, #1004 (emphasis added)).[10]

---

[10] During oral argument, Shabazz's counsel also suggested that there were other communications between the Center and NIEHS in which the Center misrepresented to NIEHS that Shabazz would conduct the Flint training sessions. However, he also stated that

14

Under Ohio law, a right of publicity claim cannot proceed where the alleged use of the plaintiff's name or likeness was "mere[ly] incidental." *Fox v. Nationwide Mut. Ins. Co.*, 117 N.E.3d 121, 145 (Ohio Ct. App. 2018) (citing *Vinci v. Am. Can. Co., 591 N.E.2d 793* (Ohio Ct. App. 1990)). For example, in *Vinci,* an Olympic weightlifter "brought a class action on behalf of himself and other Olympic athletes whose names and likenesses were used on a series of disposable drinking cups promoted by a partnership between the Minute Maid Corporation and the United States Olympic Committee." *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 929 (6th Cir. 2003) (citing *Vinci v. Am. Can Co.*, 459 N.E.2d 507 (1984 Ohio)). The court dismissed this alleged invasion of privacy as "merely incidental," noting that the "reference[s] to the athletes and their accomplishments was purely informational; there was no implication that the athletes used, supported, or promoted the product." *Vinci,* 591 N.E.2d at 794. Thus, under Ohio law, the guiding inquiry in evaluating an "incidental" defense to invasion of privacy is whether a plaintiff's name is used for informational purposes,

---

he had no direct evidence of these interactions. Instead, he appears to argue that the Court can infer such interactions took place based the erroneous NIEHS Director's Report.

In the Court's view, the Director's Report cannot bear the weight Shabazz ascribes to it. As the non-movant in this case, the Court is required to make all reasonable inferences in Shabazz's favor. *Mangum v. Repp*, 674 F. App'x 531, 536 (6th Cir. 2017). But the inference Shabazz attempts to make here is not reasonable, and thus the Court cannot consider it at the summary judgment stage. *Stackhouse v. Forward Air, Inc.*, No. 2:07-cv-1241, 2009 WL 778319, at *8 (S.D. Ohio March 20, 2009).

Shabazz has had ample opportunity to uncover evidence that Defendants used her name in their external communications regarding the Flint training sessions. And, thus far, the only direct evidence she has uncovered is the February 4 Morawetz email. At this late stage, the argument that there were other deceptive contacts between Defendants and NIEHS that have continued to evade discovery entirely is simply not reasonable.

Accordingly, while the Court considers the Morawetz email for the purposes of evaluating Shabazz's claims, it declines her invitation to infer that there were other relevant communications between the Center and NIEHS that the record has yet to reveal.

which is not actionable, or instead to create the impression of the plaintiff's endorsement or support of a given position, which is.

Here, there is no genuine dispute that Morawetz's use of Shabazz's name was purely informational. As the Center states, at the time Morawetz sent the email, its staff "was engaged in various matters to prepare for a possible Flint training, such as soliciting possible attendees and materials from various 'resources.'" (Center's Reply, Doc. 62, #2250). This explains Morawetz's references to CBTU chapters in Detroit, Lansing, and the Detroit Fire Academy, who Morawetz has stated were "local organizations that [would potentially] participate in [the] lead training." (Morawetz June Depo. Excerpts, Doc. 59-3, #1900). Through the Richmond CARAT CBTU Team, Shabazz had a connection to these organizations. Because NIEHS was presumably familiar with Shabazz through the Center's prior Big Grant application, she was a helpful point of reference for Morawetz to describe who these other organizations in Michigan were.

Thus, the Court finds that, to the extent that Defendants used Shabazz's name in their efforts to obtain funding for the Flint training session, this use was merely incidental and accordingly not actionable as an invasion of privacy.

**B.    Defendants Are Not Liable Under ODTPA Or The Lanham Act.**

Shabazz next brings claims under ODTPA and the Lanham Act. Because "the same legal analysis is employed to resolve Lanham Act claims and [ODTPA] claims," the Court only applies a Lanham Act analysis here. *Papa Ads,* 2011 WL 13186119, at *4 n.11 (internal citations omitted).

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), authorizes a civil action against, in pertinent part,

> [a]ny person who, on or in connection with any goods or services … uses in commerce any word, term, name, symbol, or device, or any combination thereof … which [ ] is likely to cause confusion, or to cause mistake, or to deceive as to the … affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a). Section 43(a) of the Lanham Act has been used to combat a wide variety of allegedly anticompetitive trade practices, including more traditional forms of trademark infringement, *see, e.g. Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d 154 (1st Cir. 1977); infringement of trade dress, *see, e.g., Craft Smith, LLC v. EC Design, LLC*, 969 F.3d 1092, 1106 (10th Cir. 2020); and—as Shabazz alleges is the case here—false celebrity endorsement. *ETW Corp.*, 332 F.3d at 925.

As the Sixth Circuit has explained, in celebrity endorsement cases, "the 'mark' at issue is the plaintiff's identity," and thus liability under § 43(a) arises when the plaintiff's identity "is connected with a product or service in such a way that consumers are likely to be misled about the celebrity's sponsorship or approval of the product or service." *Id.* at 925–26. For example, in *White v. Samsung Electronics America, Inc.*, the Ninth Circuit found that § 43(a) could support a false endorsement claim where a commercial for electronics featured a robot bearing a resemblance to the plaintiff, television celebrity Vanna White. 971 F.2d 1395 (9th Cir. 1992). Similarly, in *Allen v. Nat'l Video, Inc.*, the Southern District of New York granted summary judgment to the plaintiff, famed director Woody Allen, where the defendant

had hired a Woody Allen impersonator for its ad campaign. 610 F. Supp. 612 (S.D.N.Y. 1985).

Here, Shabazz alleges that the defendants are liable for false endorsement on two grounds. First, she claims that Defendants are liable for false endorsement for allegedly forging her signature on the Big Grant letter of support. As she explains, "the issue at hand [is] forgery—defendants simply did not have Ms. Shabazz's authorization, consent, or approval to sign her name to the letter, with the intention of passing it off as the authentic signature of Zakia Shabazz … in order to obtain federal grant funding." (Opp., Doc. 59, #1559–60).

The problem for Shabazz is that, even if the wet signature on the finalized letter was not hers, the Lanham Act only protects against the use of an individual's identity in a way that *misleads* consumers about that individual's approval or sponsorship of a given product or service. Where a plaintiff *did*, in fact, grant their sponsorship or approval, a false endorsement claim under § 43(a) cannot succeed. *L.S. Heath & Sons, Inc. v AT&T Info. Sys.*, 9 F.3d 561, 575 (7th Cir. 1993) (holding that the plaintiff's "false endorsement claim fail[ed] … because the endorsement was not 'false'—[the plaintiff] did give its endorsement and approved the ad"); *see also Klayman v. Judicial Watch, Inc.*, 629 F. Supp. 2d 112, 149 (D.D.C. 2009). During her deposition, Shabazz was shown a copy of the finalized letter of support. She was then asked, "[i]s there anything in [the letter] that's in front of you, other than your signature on it, that does not represent UPAL's position? Other than your signature." Shabazz responded that at "[t]he time that it was submitted, those things would have

certainly been true[.]"[11] (Shabazz April Depo Excerpts, Doc. 54-8, #1208–9). Thus, there is no disputing the fact that Shabazz endorsed the contents of the letter supporting the Center's application for the Big Grant.

As noted, though, perhaps if the form of the signature was significant for some reason—for example, pursuant to Ohio law or NIEHS rules—a different result may follow. But this Court already considered such an argument in the previous section, and found nothing under Ohio law or NIEHS rules suggesting that the difference between electronic and wet signatures is legally salient. Given Shabazz's concession that she agrees with the entirety of the contents in the letter attributed to her, coupled with her failure to show that the form of her signature mattered in any way, the Court rejects her attempt to rely on the allegedly "forged" signature as the basis for a false endorsement claim.

Shabazz also argues that Defendants are liable for false endorsement by misrepresenting to NIEHS that Shabazz would be involved in conducting the Center's lead training session in Flint. (Am. Compl., Doc. 46, #765). As evidence, Shabazz again points to Morawetz's February 4 email to NIEHS. Although Shabazz concedes that Morewetz's email was "technically accurate," it was "misleading, and certainly

---

[11] Shabazz's full statement was: at "[t]he time that it was submitted, those things would have certainly been true, but they would not have been intended to support any kind of lead training in Flint, Michigan or anywhere else." (Shabazz April Depo. Excerpts, Doc. 54-8, #1208–9). However, it goes without saying that Shabazz's letter would not have been intended to support lead training in Flint because, as the Center correctly explains, "at that time in 2014, no one knew anything about a Flint lead-contamination problem." (Center's Mot., 54-1, #1001).

19

allows a fact finder to reasonably conclude that Defendants engaged in conduct that violates the Lanham Act." (Opp., Doc. 59, #1560).

Shabazz is correct that a statement, even if technically true, may give rise to a § 43(a) claim if it is nonetheless "likely to cause confusion[] or to cause mistake" in the minds of consumers. 15 U.S.C. § 1125(a); *see also U-Haul Int'l v. Kresch*, 904 F. Supp. 595, 599–600 (E.D. Mich. 1995). Consequently, "in the ordinary false endorsement claim, the controlling issue is likelihood of confusion," which courts generally analyze pursuant to a multi-factor balancing test. *ETW Corp.*, 332 F.3d at 926.

However, in this case the Court finds the multi-factor balancing test is unnecessary, because, even if Shabazz could prevail in demonstrating likelihood of confusion, the Defendants' conduct would nonetheless be protected under the Lanham Act's fair use defense.

The fair use defense comes into play in situations where a plaintiff holds a trademark on a given word or phrase, but the word or phrase also retains an underlying descriptive meaning. A trademark holder "gets an exclusive right to use the mark in the way associated with his goods, but ownership of the original, descriptive sense of the word remains public." *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 857 (6th Cir. 2018). Stated differently, the fair use defense applies when "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, … of a term of device which is descriptive and used fairly and in good

faith only to describe the goods or services of such party, or their geographic origin."
15 U.S.C § 1115(b)(4).

Thus, a defendant seeking to assert a fair use defense under the Lanham Act
must prove two elements. He or she must (1) "use the label in a descriptive or
geographic sense," and (2) "do so fairly and in good faith." *Sazerac,* 892 F.3d at 857.
The Sixth Circuit has also emphasized, that "as an affirmative defense, fair use
applies even when the plaintiff has met his own burden," and thus evidence of some
degree of confusion is not dispositive in the fair use analysis. *Id.*

For example, in *ETW Corp.*, the Sixth Circuit held that the use of Tiger Woods's
name on an envelope containing an artist's picture of him was protected under the
fair use defense. The Court explained that Woods's name "was used only to describe
the content of the print, and all of the materials accompanying the print clearly
identified the artist himself as the source of the print." *Hensley Mfg. v. ProPride Inc.*,
579 F.3d 603, 612 (6th Cir. 2009) (citing *ETW Corp.*, 332 F.3d at 920–21). Similarly,
in *Hensley*, the Sixth Circuit applied the fair use doctrine when the plaintiff, a trailer
hitch manufacturer, sued one of its competitors after the competitor hired the
plaintiff's founder and namesake to design a new trailer hitch. *Id.* at 607. In
marketing the new hitch, the competitor advertised the designer's involvement, to
the chagrin of the plaintiff manufacturer that still bore the designer's name. *Id.* In
finding fair use applied, the Sixth Circuit explained that the defendant's

> advertisements do not use the name 'Hensley' in the trademark sense;
> they use Jim Hensley's name only to identify him as a designer of trailer
> hitches (including the ProPride 3P Hitch), describe his relationship to
> ProPride, and tell the story behind his success. … Because … ProPride's

uses of Jim Hensley's name are descriptive, and because Hensley Manufacturing did not allege facts from which any inference of bad faith can be drawn, we hold that the fair use defense applies in this case as a matter of law.

*Id.* at 612.

Thus, as a practical matter, the analysis required under the fair use defense to false endorsement closely parallels the analysis required under the "incidental" defense to invasion of privacy. Perhaps unsurprisingly, then, the Court's holding on this issue is also the same. In his February 4 email, ICWU Center Director Morawetz sought to obtain NIEHS funding for a Flint training session by explaining steps the Center had already taken to prepare for the session. (Center Reply, Doc. 62, #2250). This included discussing local organizations Defendants had already contacted, and Shabazz—a party with whom NIEHS was already familiar—was simply a helpful point of reference to explain who these organizations were. Moreover, nowhere does Morawetz suggest Shabazz sponsored or supported the planned training session, underscoring Defendants' good faith in their communications with NIEHS. Accordingly, the Court concludes that the reference to Shabazz and UPAL in the February 4 email to NIEHS is protected under the fair use doctrine.[12]

## C.    Defendants Are Not Liable for Common Law Fraud.

Next, the Court turns to Shabazz's fraudulent misrepresentation claim. In Ohio, the elements of fraud are:

---

[12] Although the unknown writer of the Director's Report at NIEHS ultimately *was* confused by the reference to Shabazz in the February 4 email, that is not dispositive in the fair use analysis. *Sazerac*, 892 F.3d at 857 (stating that fair use "tolerates some degree of confusion" (internal quotation marks and modifications omitted)).

> (1) a representation or, where there is a duty to disclose, concealment of fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximate[ly] caused by the reliance.

*HBA Motors, LLC v. Brigante*, No. 1:21-cv-624, 2021 WL 4709733, at *3 (S.D. Ohio Oct. 7, 2021) (citing *Aetna Cas. & Sur. Co. v. Leahey Const. Co.,* 219 F.3d 519, 539 (6th Cir. 2000)).

Here, the basis of Shabazz's fraud claim is somewhat unclear. In her Amended Complaint, she argues that the Defendants are liable because her 2014 letter of support was used to apply for a different grant than the one she understood it would be used for. (Am. Compl., Doc. 46, #766, ¶¶ 60–64). However, in her Opposition to Defendants' Motions to Dismiss, Shabazz's theory appears to have changed. (Opp., Doc. 59, #1556–57). Shabazz now alleges that liability arises from (1) the alleged forgery of Shabazz's name on the 2014 letter of support, (*id.*), and (2) the alleged use of Shabazz's name "for the purpose of obtaining funding for the lead awareness training in Flint." (*Id.* at #1557). Her briefing does not mention the theory that Shabazz's letter of support was used to apply for a different grant than originally intended. (*Id.* at #1556–57).

That Shabazz's theory has completely changed is itself fatal to her fraud claim. Fed. R. Civ. P. 8 "requires that a complaint give a defendant fair notice of a claim and its supporting facts." *Marzoula v. Cont'l Tire N. Am.*, No. 5:05-cv-2339, 2006 WL 2345529, at *3 (N.D. Ohio Aug. 11, 2006) (*citing EEOC v. J.H. Routh Packing Co.*,

246 F.3d 850, 854 (6th Cir. 2001)). Consequently, as the Sixth Circuit has explained, a "[p]laintiff cannot change its theory of the case in an effort to avoid summary judgment *after* Defendant moves for summary judgment." *Vaughn v. City of Lebanon,* 18 F. App'x 252 (6th Cir. 2001) (emphasis original). Here, Shabazz attempts to do just that, and accordingly, she has not offered any arguments in opposition to the Defendants' Motions for Summary Judgment that the Court is able to consider.

But, even if the Court could consider Shabazz's fraud claim as asserted in her Opposition, Shabazz would not prevail. Under Ohio law, "a party is unable to maintain an action for fraud where the fraudulent representations were not made directly to him to induce him to act on them in matters affecting his own interests." *Floyd v. Bank of Am., N.A.*, No. 1:13-cv-2072, 2014 WL 3732591, at *9 (N.D. Ohio July 25, 2014) (citing *Baddour v. Fox*, No. 03CA–77, 2004 WL 1327925, at *4 (Ohio Ct. App. June 4, 2004)); *see also Moses v. Sterling Commerce Am., Inc.*, No. 02A P–161, 2002 WL 1938575, at *3 (Ohio Ct. App. Aug. 15, 2002) ("The elements of fraud must be directed against the alleged victim.").

Although Shabazz describes two alleged incidents of fraud in her Opposition, neither of these incidents, even if true, would constitute fraud against *her*. First, the allegedly forged signature in the letter of support would have been designed to deceive *NIEHS* as to Shabazz's endorsement. It would not have been designed to deceive Shabazz or induce her into any sort of action. Second, the February 4 email to NIEHS regarding the Flint training session, even if it had used Shabazz's name in such a way as to give the false impression she would lead the session, similarly fails

24

because this would have constituted fraud *on NIEHS*. In short, even if the Court could consider Shabazz's fraud claim as described in her Opposition, this claim would fail because the fraud in question would not have been directed against her.

**D.    Defendants Are Not Liable for Civil Conspiracy.**

Finally, Shabazz alleges that Defendants are liable for civil conspiracy. However, "a civil conspiracy claim is derivative and cannot be maintained absent an underlying tort that is actionable without the conspiracy." *Burgess v. Fischer,* 735 F.3d 462, 483 (6th Cir. 2013) (quoting *Morrow v. Reminger & Reminger Co., L.P.A.*, 915 N.E.2d 696, 711–12 (Ohio Ct. App. 2009)).

Because the Court has rejected each of Shabazz's claims that would have provided an underlying basis for civil conspiracy, the Court also grants summary judgment for Defendants on this derivative claim.

## CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motions for Summary Judgment (Docs. 54, 55, 56, 57) and **DENIES AS MOOT** Defendants' Motion to Strike (Doc. 61) the East Affidavit.

Accordingly, the Court **DISMISSES** this action **WITH PREJUDICE**. The Court further **DIRECTS** the Clerk to **ENTER JUDGMENT** in Defendants' favor and terminate this matter on the Court's docket.

**SO ORDERED.**

December 30, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**